**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHELLE K.,**

                              **Plaintiff,**

        **v.**                                                  **8:17-CV-405**
                                                                     **(TJM)**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**
_____

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

## DECISION & ORDER

        Plaintiff Michelle K. brings this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g), for review of a final determination by the Commissioner of Social Security

denying her application for benefits.  Plaintiff alleges that the Administrative Law Judge's

decision denying her application for benefits was not supported by substantial evidence

and was contrary to the applicable legal standards.  Pursuant to Northern District of New

York General Order No. 8, the Court proceeds as if both parties had accompanied their

briefs with a motion for judgment on the pleadings.

## I.    PROCEDURAL HISTORY

        In June, 2014, Plaintiff turned 18 years old.  Before that date, she received SSI

benefits as a minor.  On October 22, 2014, a reviewer performed the required reevaluation

and concluded that Plaintiff was not disabled by the adult standards.   A state Disability

Hearing Officer upheld that decision on March 12, 2015.  On March 23, 2015, Plaintiff filed

a written request for a hearing pursuant to 20 C.F.R. § 416.1429.  Administrative Law

Judge ("ALJ") Jennifer Gale Smith presided over this hearing on September 10, 2015.  The

ALJ issued an unfavorable decision on November 4, 2015, which Plaintiff appealed.  The

Social Security Appeals Council denied Plaintiff's request for review on February 8, 2017.

Plaintiff now brings this action under 42 U.S.C. § 405(g), to review the Commissioner's final

decision.

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts

relevant to the Court's decision.

## III.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

The question before the ALJ was wether Plaintiff was disabled under Section

1615(a)(3)(A) of the Social Security Act.  The ALJ engaged in the five-step analysis

required by 20 C.F.R. § 416.920(a) to determine whether a claimant qualifies for disability

benefits.  See Social Security Administrative Record ("R."), dkt. # 10, at 14-23.

> The Social Security Administration regulations outline the five-step,
> sequential evaluation process used to determine whether a claimant is
> disabled: (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a "residual
> functional capacity" assessment, whether the claimant can perform any of his
> or her past relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant can
> perform given the claimant's residual functional capacity, age, education, and
> work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

The ALJ applied these five steps.  At Step 1, the ALJ found no need to evaluate

whether Plaintiff had a history of substantial, gainful activity in the instant proceeding because such an evaluation was unnecessary for a judge redetermining disabilities after attaining age 18. R. at 14. In any case, the ALJ found that Plaintiff had no past relevant work. Id. at 22. At Step 2, the ALJ found that Plaintiff suffered from the severe impairments of pervasive developmental disorder, attention deficit hyperactivity disorder ("ADHD"), intellectual disability, social communication disorder, Autism Spectrum Disorder ("ASD"), and a learning disability in math. Id. at 15. At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically exceeded the severity of a listed impairment in 20 C.F.R. 416.920(d), 416.925, and 416.926. Id. at 16.

At step four, the ALJ held that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. Id. at 18. Plaintiff could work in low-stress jobs and work at simple, routine, and repetitive tasks that were goal oriented. Id. She could not perform production-pace work. Id. The ALJ used a two-step process to make this determination. First, the ALJ considered whether an underlaying medically determinable physical or mental impairment could reasonably be expected produce the Plaintiff's symptoms. Next, the ALJ evaluated the intensity, persistence, or functionally limiting effects of the symptoms. Id. This evaluation came from a consideration of the entire case record. Id.

The ALJ found that Plaintiff's medically determinable impairment did not support Plaintiff's claim that she could not work. Id. at 19. Among other items, the ALJ considered the Plaintiff's IQ scores (before the February 2015 test), Plaintiff's school records, Plaintiff's daily activities, and the opinion of evaluating consultant Richard Williams, PhD, an opinion

the ALJ gave great weight. Id. at 19-21. The ALJ also gave some weight to the opinion of State Agency psychological consultant A. Herrick, PhD. Id. at 21. Conversely, the ALJ afforded little weight to the testimony of Plaintiff's aunt/mother, Ann Hammac. Id. at 20. The ALJ also assigned little weight to the medical opinions of Plaintiff's resource room teacher, Susan Gerrish, who was not a medical professional. Id. The ALJ also gave little weight to an evaluation by Jessica Paxton, PhD, a psychologist who had examined Plaintiff in February 2015. The ALJ found this opinion was not supported by the evidence of the record. Id. at 20-21.

Finally, the ALJ addressed the step-five determination concerning Plaintiff's ability to work considering her residual functional capacity, age, education, and work experience. Id. at 20-21. The ALJ employed the Medical-Vocational guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2 (2015). Id. at 22. Determining that testimony of the vocational expert was consistent to the evidence of record, the ALJ concluded there were ample jobs available which Plaintiff could perform. Id. at 22-23. Based upon this five-step evaluation, the ALJ found that Plaintiff's disability ended on October 22, 2014, and Plaintiff had not become disabled since.

## IV.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must

determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted). In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990)(quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

Plaintiff alleges three broad errors in the ALJ's opinion, which the Court will address

in turn.

**A.    Consideration of Impairments**

Plaintiff first argues that the ALJ erred in considering her mental impairments.

The ALJ found that Plaintiff suffered from "the following severe impairments: pervasive developmental disorder, attention deficit hyperactivity disorder, intellectual disability, social communication disorder, Autism Spectrum Disorder, and learning disability." R. at 15. The ALJ then concluded that Plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the Federal Code of Regulations. Id. at 16. The ALJ employed the listings in place at the time of her October, 2015 decision. See 20 C.F.R. Part 404, Subpt. P, App. 1 (2015). The ALJ turned to listing 12.05, which covered intellectual disabilities and stated as a condition of the listing that a claimant have "significantly subaverage general intellectual functioning with deficits in adaptive function initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. at Subpt. P., App.1, § 12.05. At that time, a claimant could qualify as disabled when the claimant met this general requirement and "the requirements" in one of four specific areas were "satisfied." Id. First, "[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." Id. at § 12.05(A). Second, "[a] valid verbal, performance, or full scale IQ of 59 or less." Id. at § 12.05(B). Third, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. at § 12.05(C). Or "[a] valid verbal,

6

performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id. at § 12.05(D).

The ALJ concluded that the severity of Plaintiff's disabilities did not meet the requirements of the listing in Section 12.05. R. at 16. Plaintiff's condition did not meet the requirements of paragraph A because no evidence indicated that she had to "depend upon others for her personal needs." Id. Her condition did not meet paragraph B because she did not have any valid IQ score of 59 or less. Id. Her lowest documented IQ score was 68. Plaintiff did not meet the requirements of paragraph C either, the ALJ found. Id. First, the ALJ concluded that she did not have a valid IQ score below 70. Id. The ALJ pointed to IQ tests from 2005 and April 2014. Id. In those tests, all of Plaintiff's IQ scores exceeded 70. While one test, performed in February 2015, produced a full-scale IQ of 68, the ALJ rejected that score. Id. The ALJ pointed out that "there is no documentation of a head injury or other condition that would explain such a significant decline in intellectual functioning between 2014 and 2015." Id. The ALJ also found it significant that "the redetermination of [plaintiff's] disability began in September 2014" and that process "would be an incentive for her not to perform her best when tested in February 2015." Id. In any case, the ALJ found, Plaintiff lacked "the documented deficits in adaptive functioning that are required to meet Section 12.05." Id. Plaintiff did not have another impairment that caused "additional and significant limitations." Id. at 17. Plaintiff's "mental impairments cause the same functional limitations." Id. The ALJ also found that paragraph D did not apply, even if an IQ score below 70 existed. Id. Plaintiff lacked a marked limitation in any

listed area, but instead had only mild or moderate limitations.  Id.

Plaintiff challenges these findings.  First, she argues that the ALJ improperly rejected her IQ scores below 70 by substituting her own judgment for that of the medical evaluators and failed to follow court directives that an ALJ accept the lowest IQ score unless that score was inconsistent with the record as a whole.  Second, Plaintiff argues that the ALJ erred in failing to find significant deficits from other conditions which would have qualified Plaintiff as disabled under the listing in paragraph C.

### i.    IQ Test

Plaintiff first argues that the ALJ erred by failing to credit the lowest IQ score she received.  "Regulations provide that the SSA considers the lowest IQ score derived from a single test."  Davis v. Astrue, 2010 U.S. Dist. LEXIS 73225, at *16 (N.D.N.Y, July 21, 2010) (citing 20 C.F.R. Pt. 404 Subt. P. Ap. 1, § 12.00(D)(6)(c)).  "Although there is no definite rule on the issue of how to reconcile multiple IQ results, courts tend to prefer the lowest IQ score across multiple, valid tests."  Id.  An ALJ who finds scores lower scores invalid must "explain the basis for this decision."  Id. at *17.

Two different examining psychologists administered IQ tests to Plaintiff in April 2014 and February 2015.  The ALJ credited Jane Bishop's findings from April 2014.  Bishop was Plaintiff's high school guidance counselor.  R. at 16.  The ALJ did not credit Dr. Paxton's February 2015 IQ test.  R. at 16.  Those results would have placed Plaintiff's IQ score below 70 and qualified her for consideration under paragraphs C and D.  As explained above, the ALJ reached this conclusion by pointing to a lack of evidence of injury or other medical change that could explain a dip in IQ scores, and to Plaintiff's knowledge that her eligibility for Social Security benefits was the subject of redetermination.

8

The ALJ's conclusion was based in part upon consideration of the history of Plaintiff's IQ scores, which had been fairly consistent from 2005 until her most recent examination. The ALJ could consider the stability of IQ scores over time in finding the final score an outlier. The Second Circuit Court of Appeals has found that "[w]e agree with the majority of our sister Circuits that it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a 'fairly constant IQ throughout [their] li[ves].'" Talavera v. Astrue, 697 F.3d 145, 152 (2d Cir. 2012) (quoting Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir.2001). Courts have found that an ALJ has discretion to give little weight to results from IQ examinations not consistent with the record as a whole. See Burnette v. Colvin, 564 Fed. Appx. 605, 608 (2d Cir. 2014) ("The ALJ, however, properly exercised his discretion in giving little weight to Dr. Ransom's evaluation, as that evaluation was inconsistent with the record as a whole"); see also Baszto v. Astrue, 700 F.Supp.2d 242, 248 (N.D.N.Y.2010) ("[A]n ALJ may reject an IQ score as invalid when it is inconsistent with the record.") (citing Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir.2007) (noting that ALJ may consider other record evidence to determine whether reported IQ score was "accurate reflection of [claimant's] intellectual capabilities")). Of course, the ALJ would have to have substantial evidence for her conclusion that the latest score was invalid. See Brothers v. Colvin, 233 F.Supp.3d 320, 327 (N.D.N.Y. 2017) ("If the ALJ intended to find the full scale score of 74 invalid, she was required to explain why that score is inconsistent with the medical evidence.").

Plaintiff argues that the ALJ erred by concluding that the evidence indicated Plaintiff had put forth less than optimal during her most recent tests: "[n]otably, however, the redetermination of [Plaintiff's] disability . . . would be an incentive for her not to perform at

her best when tested in February 2015." Id. at 16.  The ALJ speculated that the SSI reconsideration may have played a role in the difference between Plaintiff's earlier scores and her most recent one.  Id.  The ALJ also noted that no evidence of any head injury or other event which would have decreased Plaintiff's test scores occurred.  Plaintiff counters that the examining expert, Jessica Paxton, PhD, stated that "[Plaintiff] appeared to put forth optimal effort on the tasks and her performance on tests assessing effort did not indicate suboptimal effort[.]"  R. at 377.

The Court finds that the ALJ erred in failing to credit the most recent (and lowest) IQ score.  While the ALJ pointed to evidence of the consistency of scores over time, the ALJ also relied on her conclusion that Plaintiff's last test was invalid because of a lack of effort. This conclusion, however, was purely speculative, based solely on the timing of the exam. Dr. Paxton, who administered the exam and signed the report, came to a different conclusion.  Dr. Paxton reported that Plaintiff "was cooperative throughout the testing session and appeared to put forth optimal effort on the tasks and her performance on tests assessing effort did not indicate suboptimal effort."  R. at 377.  The ALJ's conclusion here was both speculative and a substitution of her assessment of Plaintiff's effort for that of the person who actually administered the exam.  "Neither a reviewing judge nor the Commissioner is 'permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.'" Burgess v. Astrue, 537 F.3d 117, 131 (2d Cir. 2008) (quoting Shaw v. Carter, 221 F.3d 126, 134 (2d Cir. 2000)).  The Court therefore finds that the ALJ erred in failing to credit the lowest IQ score recorded by the Plaintiff.

### ii.    Section 12.05(C) Evaluation

The ALJ concluded, however, that Plaintiff did not meet the listing in 12.05(C), even

10

if she had an IQ between 60 and 70.  The Court will address this issue, as Plaintiff does

not meet the listing unless she meets all the requirements of the listing.   Plaintiff argues

that the ALJ erred in failing to consider all of Plaintiff's impairments for Listing 12.05(C).

Plaintiff argues that the ALJ committed error by concluding that Plaintiff's learning

disabilities and mental impairments caused the same functional limitations.

With respect to her Section 12.05(C) evaluation, the ALJ concluded that Plaintiff

lacked "the documented deficits in adaptive functioning that are required to meet Section

12.05."  R. at 16.  In addition, Plaintiff lacked "another impairment that causes additional

and significant limitations."  Id. at 17.  Instead, Plaintiff's "mental impairments cause the

same functional limitations."  Id.

 "For a claimant to show that his impairment matches a listing, it must meet all of the

specified medical criteria.  An impairment that manifests only some of those criteria, no

matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  The

government argues that Plaintiff failed to meet Listing 12.05's "threshold requirement of

proving she had deficits in adaptive functioning initially manifested during the

developmental period."  That section requires that a claimant possess "significantly

subaverage general intellectual functioning with deficits in adaptive function initially

manifested ruing the development period."  Appex. 1 to Subpart P of Part 404 § 12.05.

This threshold requirement mandates that "an applicant's inadequate adaptive functioning

must arise from her cognitive limitations, rather from a physical ailment or other infirmity."

Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012).  "Adaptive functioning refers to an

individual's 'ability to cope with the challenges of ordinary everyday life.'" Id. (quoting Novy

v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007)).

The Court finds that the ALJ had substantial evidence to support her conclusion that Plaintiff failed to meet the threshold requirement that she have sufficient deficits in adaptive functioning. In discussing Plaintiff's activities of daily living, the ALJ noted a "mild restriction," but found that "claimant reports that she cares for dogs and goats, takes out the garbage, folds laundry, and puts dishes away." R. at 17. Plaintiff "attended school and graduated," and her failure to find employment, the ALJ noted, came because she chose not to work; "there is no indication that she is unable to perform work-like activities of daily living." Id. Evidence in the record supports these findings. During a 2017 psychological exam, Plaintiff reported that she fed the dogs, goats, and chickens at home. Id. at 333. She also reported she took out the garbage, folded laundry, and put away dishes, even if she did not cook, drive, or handle bills. Id.; see also R. at 172-174 (mother's report confirms these activities). In a 2014 yearly evaluation for her Individualized Education Plan (IEP), Plaintiff's general education teacher reported that she was "doing well in class, has an excellent work ethic, and is very thorough in her work." Id. tat 236. Her transcripts reveal that she graduated high school with a local diploma and some Regents classes. Id. at 273. The ALJ thus had substantial evidence in the record for her conclusion that Plaintiff–despite the limitations caused by her mental capacity–could cope with the activities of everyday life. See, e.g., Bushey v. Berryhill, 2018 U.S. App. LEXIS 17330 at *7-8 (2d Cir. June 26, 2018) (plaintiff lacked qualifying deficits in adaptive functioning because–despite a valid full-scale IQ score of 66–plaintiff was able to function on a daily basis, maintain a schedule, groom and dress herself, and care for children).

The Plaintiff also contends that the ALJ erred in failing to consider listing 12.10, which deals with disabling conditions caused by autism. The record indicates that some

12

medical professionals diagnosed Plaintiff with autism spectrum disorder. To qualify as disabled under listing 12.10, a plaintiff must, in relevant part, show both medical evidence of autism or another disorder resulting in certain limits on social interaction and verbal communication and that the medical condition causes at least two of: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Appendix 1 to Subpart P of Part 404 § 12.10.

The ALJ addressed all of these issues in concluding that Plaintiff did not qualify as disabled under Listing 12.05(D). The ALJ found only mild restrictions in daily living, because Plaintiff reported she is able to care for animals, do basic chores, and graduated from school. R. at 17. The decision notes moderate restrictions in social functioning based upon teacher reports and school disciplinary records. Id. The ALJ found that Plaintiff had moderate impairments in concentration, persistence, or pace, based upon the medical evaluations conducted in 2014. Id. There are no episodes of decompensation in the record. Id. Plaintiff did not challenge these findings as unsupported by substantial evidence, and the Court agrees in this respect. The evidence of record provides substantial evidence of the ALJ's conclusions here too.

The Court will therefore deny the Plaintiff's motion with respect to her argument that the ALJ lacked substantial evidence for her conclusion that Plaintiff did not meet the listings for disability in Sections 12.05 and 12.10.

### B.    Opinion Evidence

Plaintiff next asserts that the ALJ erred in assigning the weight she did to the opinion

13

evidence. The Court will address each challenged opinion in turn.

### i. Dr. Williams

Dr. Richard Williams, Ph.D., a clinical psychologist, prepared a psychological evaluation of Plaintiff on August 5, 2014. See R. at 332-333. Williams reported that the New York State Officer of Disability Determination referred Plaintiff to him for an evaluation "to assess psychological functioning." Id. at 332. According to Williams, Plaintiff had "a reported history of Attention Deficit Hyperactivity Disorder (ADHD) and borderline intellectual functioning." Id. No previous reports were available for Williams to review. Id. Williams interviewed Plaintiff, who told him of her difficulties with distraction in the classroom and her need to use Adderall to help her focus. Id. Williams also reported that Plaintiff got "along well" with her parents and did not have "any trouble with moods." Id. Anxiety came only in connection with her Regents exams. Id. While she had few friends, she did have a boyfriend who visited her. Id. After the examination, Williams diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder, by history. Id. He ruled out Borderline Intellectual Functioning vs. Learning Disorder. Id. at 333. In the end, Williams concluded that Plaintiff "reports trouble with attention but said that it is much better with her medication." Id. While she had difficulties "in school," Plaintiff still planned to take Regents exams. Id. Though Williams "suspect[ed]" a "learning disability," a lack of "additional records" prevented "a more definitive diagnosis." Id. Still, "[b]ased upon her interview, it appears that she would be able to learn and perform non-skilled jobs, as long as she is taking her medication." Id.

The ALJ read this opinion to be that "claimant is able to learn and perform non-skilled jobs as long as she is taking medication." Id. at 21. The ALJ gave the opinion

14

"great weight." Id. The opinion, the ALJ found, deserved such weight "because it is a medical opinion and is supported by Dr. Williams' findings upon examining the claimant." Id. The ALJ explained:

> During the examination, the claimant was well groomed, friendly, and cooperative. (Exhibit 4F, p. 1). She was alert and oriented. She had good mental control. She was able to state the days of the week backward and perform serial 3s (Exhibit 4F, p. 1). The claimant's immediate and delayed recall was good (Exhibit 4F, p. 1). Her abstract thinking was poor, her insight and judgment were fair (Exhibit 4F, p. 1). The claimant's mood was neutral and her affect was appropriate. She reported that her energy level is good (Exhibit 4F, p. 1). The claimant's speech was normal. She reported a broad range of daily activities and reported socializing with her boyfriend (Exhibit 4F, p. 1-2). These findings and reported activities support Dr. William's opinion.

Id.

Plaintiff complains that the ALJ gave the report improper weight. Plaintiff contends in part that Dr. Williams' findings were impermissibly vague. A consultative examiner's opinion cannot provide substantial evidence when that "opinion is so vague as to render it useless[.]" Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000); see also Selian v. Astrue, 708 F.3d 409, 421 (2d. Cir. 2013) (finding that the consultive examiner's opinion was so remarkably vague it left the ALJ's decision to "sheer speculation"). However, "use of terms like 'mild' and 'moderate' may pass substantial evidence muster when medical evidence shows relatively little physical impairment." Zongos v. Colvin, No. 5:12-CV-1007, 2014 WL 788791, at *10 (N.D.N.Y. Feb. 25, 2014) (citing Tankisi v. Commissioner of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir.2013)).

The Court is unpersuaded that Dr. Williams' opinion is impermissibly vague. Plaintiff does not point to any findings in the report or any conclusions that forced the ALJ to engage in speculation about Plaintiff's capabilities. Instead, Plaintiff complains about the

15

records that Williams used to compile his opinion.  As explained above, Williams offered

both a clear diagnosis of Plaintiff's mental state and a clear recommendation on the work

she could perform.  Under those circumstances, the report is not so vague as to fail to

provide substantial evidence for the ALJ's conclusions.  Plaintiff's real argument with

Williams' report appears to be that the report lacks a proper foundation for the conclusions

it reaches.  As is clear from the excerpt of the ALJ's opinion related above, however, the

ALJ relied on the report because Williams had actually examined the Plaintiff, and his

conclusions found support in Plaintiff's school records and other record evidence.  The

ALJ's use of the report on that basis was supported by substantial evidence, and the Court

will deny the Plaintiff's motion on these terms as well.

> ii.    **A. Herrick**

Plaintiff next argues that the ALJ gave excessive weight to the report of non-

examining review specialist A. Herrick.  Herrick did not examine Plaintiff, and giving

Herrick's views the same weight as that of an examining specialist was clear error, Plaintiff

argues.

A. Herrick, whose specialty is listed as "Psychology," performed two assessments

on August 27, 2014.  See R. 334-350.  The first assessment, a "psychiatric review technic,"

came in a form Herrick filled out that consists largely of check boxes.  Id. at 334-347.   In

that assessment, Herrick concluded that Plaintiff had a "medically determinable

impairment" of ADHD.  Id. at 334.  After this determination, Herrick rated Plaintiff on the

degree of limitation she suffered from her condition in the four categories described above

for the Section 12.05(D) listing.  Herrick found Plaintiff mildly restricted on activities of daily

living and in maintaining social functioning, that she had moderate difficulty in maintaining

concentration, persistence and pace, and that she had never had any repeated episodes of deterioration.  Id. at 344.  Herrick's second assessment examined Plaintiff's residual functional capacity.  Id. at 348-50.  The assessment form again features check boxes for various limitations.  Id.  A "summary conclusions" section makes clear that "[t]his section is for recording summary conclusions derived from the evidence in file."  Id. at 348.  Herrick's assessment found Plaintiff either "not significantly limited" or "moderately limited" in every category.  Id. at 348-349.  Herrick also included a written evaluation which noted that "[e]vidence from school classifies her as Other Health Impaired and notes that she is on medication for attentional issues."  Id. at 350.  The report notes Plaintiffs' 2012 test scores and April 2014 IQs scores, as well as that she used and IEP which found that "to meet the demands of regular classroom work . . . she needed [the] services of [the] Resource Room."  Id.  Herrick also reported Williams' diagnosis.  Id.  Herrick described Plaintiff's functioning by referencing records in the file.  Id.  Herrick noted that "[c]laimant continues in school; is able to take care of A[citivities] of D[aily] [L]iving, but needs reminders regarding her hygiene."  Id.  Herrick also described Plaintiff's care for dogs and goats at home, and notes that Plaintiff "is reported to be forgetful and distractible, therefore not doing meal preparation."  Id.  Plaintiff performed other "household chores," but did not handle money, "because she is easily confused."  Id.  Plaintiff's aunt also reported "low social skills."  Id.  Still, [i]n spite of these, they are not considered to be marked, and claimant is thought to be able to do work activities."  Id.

The ALJ summarized these findings.  Id. at 21.  She noted that "Dr. Herrick concluded that the claimant is able to perform work activities despite her impairment and limitations."  Id.  The report deserved "some weight in determining the claimant's residual

17

functional capacity," the ALJ found, "because it is a medical opinion and is consistent with Dr. Williams' examining source opinion, the claimant's reported activities of daily living, and the claimant's school records and grades." Id. Plaintiff contends the ALJ erred because the consultant did not examine Plaintiff, and because the consultant did not include any assessment of Plaintiff's autism spectrum disorder and her assessment contradicted that of Dr. Paxton.

The Court finds that the ALJ properly gave the report of the state agency consultant some weight. "The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record." Frye ex rel. A.O. v. Astrue, 485 Fed. Appx. 484, 487 (2d Cir. June 13, 2012). Here, the ALJ applied Herrick's report in determining Plaintiff's capacities, explaining the weight she provided that opinion by referencing consistencies in the record between Herrick's findings and the record in the case. Having examined that record, which contains evidence by medical providers of the limitations the consultant found, as well as numerous statements concerning Plaintiff's ability, despite her limitations, to engage in the listed activities, the Court concludes that substantial evidence supports the weight provided to Herrick's opinion by the ALJ.

### iii.    Susan Gerrish

Susan Gerrish, who taught Plaintiff for eight years, completed a Teacher Questionnaire for the Social Security Administration on May 1, 2015. R. at 228-235. Gerrish's evaluation began with a statement that "Michelle's full-scale [IQ] score on April 2014 was 82. When retested in February 2015 [her] full scale score fell to 68. Cognitive loss is an indicator of neurofibromatosis." Id. at 228. In the area of acquiring and using

18

information, Gerrish rated Plaintiff as having "a slight problem" when compared to other non-impaired students her age. Id. at 229. Plaintiff had "a long history of providing too much information and trying to justify responses. Many attempts have been made to help change the pattern but she is very resistant to change (Autisim)." Id. In the area of attending and completing tasks, Gerrish did not provide an overall rating, but on thirteen different metrics found Plaintiff had no problem in seven categories and an obvious problem in six others. Id. at 330. Plaintiff's obvious problems included "carrying out multi-step instructions, waiting to take turns, changing from one activity to another without being disruptive" and "working at a reasonable pace/finishing on time." Id. Gerrish reported that "Michelle is very organized. She does use extended time when completing work. She gets annoyed easily when shifting tasks is required." Id. Gerrish found more significant problems in the area of interacting and relating to others. Id. at 231. She concluded that Plaintiff "often annoys those around her" who "try to make conversation, especially peers." Id. Those peers often just "give up" because Plaintiff refuses to converse and instead argues. Id. In caring for herself and others, Plaintiff also had problems: she created for other students made uncomfortable by Plaintiff's "constant 'picking at' her rear-end." Id. at 233. Gerrish again raised the issue of neurofibromatosis and autism when asked to discuss medical issues and provide a final evaluation. Id. at 234-35. Gerrish also found, however, that Plaintiff "does have some strengths. She wants to do well. She is very organized. She is very rule bound." Id. at 235 (emphasis in original).

The ALJ noted that this opinion indicates that Plaintiff "has problems acquiring and using information, attending to and completing tasks, relating with others, and caring for herself." Id. at 20. Moreover, the ALJ points to Gerrish's claims that "claimant has signs of

19

neurofibromatosis, a large head, bowed legs, and traits of autism" and urged further

medical examination.  Id.  The ALJ assigned little weight to the opinion:

> because it is not a medical opinion.  Moreover, the claimant does not have a documented history of neurofibromatosis.  The evidence does not suggest that her large heard and bowed legs cause any work-related functional limitations.  While the claimant has been diagnosed with several mental impairments, including pervasive developmental disorder, attention deficit hyperactivity disorder, intellectual disability, social communication disorder, Autism Spectrum Disorder, and learning disability in math, her academic records, activities of daily living, and presentation during the hearing suggest that she is able to meet the basic mental demands of at least unskilled work despite her impairments.

Id.

Plaintiff argues that the ALJ violated Social Security regulations by failing to provide

sufficient weight to Gerrish's statements about Plaintiff's abilities.  According to Plaintiff, the

ALJ misstated Gerrish's conclusions about Plaintiff's limitations in interacting and relating

with others and taking care of herself.  A proper reading of Gerrish's opinion would have

led to a finding of disability for Plaintiff.

The Court finds that the ALJ had substantial evidence to support the weight she

assigned Gerrish's opinion.  As to Gerrish's claims that neurofibromatosis explained

Plaintiff's decline in IQ scores, the ALJ correctly rejected that opinion as speculation by a

non-medical professional.  The evidence of record indicates that Plaintiff–whose family has

a history of the disease–has not been diagnosed with that disease.  R. at 376.  As to

Plaintiff's complaint that the ALJ failed to credit Gerrish's opinions about her abilities, the

Court notes that the ALJ acknowledged that assessment, but pointed to other evidence in

the record which indicated that Plaintiff's abilities exceeded those assessed by Gerrish.

Since the ALJ pointed to evidence of record that shared this assessment, the Court must

conclude that substantial evidence supported that opinion and deny the motion on these grounds as well.

### C. Assessment of Plaintiff's Testimony

Finally, Plaintiff argues that the ALJ erred by relying on Plaintiff's testimony that she could work by chose not to. Plaintiff contends that the ALJ failed to consider her mental condition in reaching this conclusion. The government responds that Plaintiff's testimony demonstrated sufficient self-awareness and insight to credit those statements.

Plaintiff testified before the ALJ on September 10, 2015. See R. at 32-53. The ALJ asked Plaintiff about her plans for her future after high school. Id. at 33. Plaintiff testified that she had not looked for work. Id. at 33. Asked why, Plaintiff explained that "I'm the type of person that does not like doing work . . . I'm, like, the type of person that likes to sit around at home and do nothing instead of going to find work." Id. at 34. Plaintiff could not explain why she had that attitude. Id. The ALJ pressed Plaintiff for an answer. Id. Plaintiff stated that she enjoyed going to school, and the ALJ asked "[w]hat makes you think you wouldn't like going to work then?" Id. Plaintiff still could not provide an answer, other than persisting in her explanation that "I'm the type of—I just don't like doing work." Id. Plaintiff also could not explain why she had not sought vocational counseling. Id. at 35. The ALJ then asked for a specific reason why Plaintiff felt she could not work. Id. Plaintiff explained that she would have trouble in a job that dealt with money because she had difficulty dealing with money while shopping. Id. Plaintiff also explained that she refused to do work at times when her parents requested and that sometimes she gave teachers "a hard time" if they asked her to write "essays and stuff." Id. at 37. Plaintiff further testified that her parents supported her financially. Id. at 38. She initially testified that if her parents

withdrew that support, she would not try to get a job.  Id.  When the ALJ asked "[i]f you didn't have food, if you didn't have a place to live, would you go out and look for a job," however, Plaintiff agreed that she would seek work.  Id. at 39.  The ALJ concluded her examination by questioning Plaintiff about her daily activities and social life.  Id. at 39-40.

The ALJ summarized Plaintiff's testimony in her decision.  Id. at 19.  According to the ALJ

> The claimant graduated with a non-Regents diploma, but testified that she did take some Regents exams while in school.  She said that she did well on some exams.  She testified that she has not looked for work, has not sought vocational counseling, and has no plans for her future (Testimony).  When asked why she has not looked for work, the claimant explained that she is the type of person that does not like doing work.  She explained that she is the type of person who likes to sit at home and do nothing instead of find work (Testimony).  She said that she works at a slow place and takes her time doing things because she doesn't like to work.  The claimant also testified that she did not give her teachers a hard time in school and did not give her former boyfriend a hard time, because of the potential consequences (Testimony).  She is capable of behaving but chooses not to if she can get away with it (Testimony).  She testified that her parents support her financially and that she sits around watching TV and playing on the computer.  The claimant's testimony suggests that she chooses not to work, but is able to do so.

Id.  In the end, the ALJ concluded that her assessment of Plaintiff's Residual Functional Capacity was supported by the opinions of Dr. Herrick and Dr. Williams, "the claimant's reported activities of daily living, the claimant's school records, and the claimant's testimony regarding her preference not to work."  Id. at 22.

Plaintiff argues that the ALJ used a single phrase from Plaintiff–that she did not like to work–and ignored evidence of Plaintiff's mental limitations and lack of insight and judgment, as well as her difficulties in acting to find work or even take steps towards employment.  While the ALJ could have discounted that statement based on Plaintiff's established limitations and expert evidence that indicated limited insight, even without that

statement the ALJ had–and pointed to–substantial evidence supporting her assessment of Plaintiff's ability to work. The ALJ summarized this evidence and pointed to that evidence in concluding that Plaintiff could work. The ALJ noted that Plaintiff's school records indicated an ability to engage in and complete tasks, and intellectual functioning that resulted in passing grades and a diploma. Plaintiff, as explained above, engaged in activities of daily living that demonstrated an ability to work. Eliminating Plaintiff's statement that she did not desire to work would not eliminate this evidence. Moreover, accepting that statement as false would only indicate that Plaintiff had a desire to work, not whether she could work. The ALJ would still be required to examine other evidence to make that determination. She had substantial evidence to reach the conclusion she did.

This case is different from <u>Cook v. Astrue</u>, No. 08cv1351, 2011 WL 2490996 (N.D.N.Y. May 24, 2011), on which Plaintiff relies. The differences are instructive for this matter. In <u>Cook</u>, an expert had concluded that plaintiff faced "marked limitations with respect to understanding, remembering, and carrying out detailed instructions." <u>Id.</u> at *7. The expert also found "marked limitations in terms of responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting." <u>Id.</u> Further, plaintiff had poor judgment, did not deal well with stress, and had difficulty with keeping attention and concentration. <u>Id.</u> Plaintiff also had "marked anxiety in social settings." <u>Id.</u> At her administrative hearing, however, the plaintiff testified that she could work in a small office setting, provided she had an opportunity to know coworkers or–in a larger setting–a chance for a private workspace. <u>Id.</u> The ALJ gave considerable weight to the expert's opinions, "but discounted the treating psychiatrist's findings to the extent they were inconsistent with Plaintiff's statements concerning her

vocational abilities[.]" Id. The ALJ considered such statements "admissions." Id.

The court in Cook found error in this treatment of Plaintiff's statements. Id. at *7-8. "The ALJ and the Commissioner," the court found, "both ignore an obvious, material fact. Plaintiff suffers from severe mental impairments.' Id. at *7. "[T]here is good reason to conclude that Plaintiff overstated her abilities for fear of offending the ALJ and/or because her judgment/insight was impaired by her mental impairments." Id. The record contained evidence that Plaintiff "tended to exaggerate her vocational abilities." Id. at *8. The record also demonstrated that Plaintiff had an opinion of her abilities that was too optimistic. Id. Her mental condition, particularly her social anxieties, would likely prevent plaintiff from performing as an employer would require. Id. "At the very least," the court concluded, "the ALJ was bound to give an explanation as to why he was crediting Plaintiff's statements regarding her vocational abilities when the actual evidence (in the form of a detailed, strongly-worded letter from her long-term employer) contradicted those statements." Id. The court reversed the ALJ's decision, finding that "[g]iven Plaintiff's history of overestimating her vocational abilities, impaired judgment, evident anxiety during her testimony and apparent desire to please the ALJ, and the first-hand evidence of significant difficulties coping with stress and maintaining attendance even in a highly-structured wor setting, the ALJ's decision to give Plaintiff's testimony more weight than Dr. Zollo's opinion was not supported by substantial evidence and amount to reversible error." Id. at *10.

The differences between the ALJ's treatment of Plaintiff's testimony in this case and in Cook are instructive. In Cook, the ALJ used the Plaintiff's statements to reject other evidence that plaintiff had substantial limitations and made her unable to work. The plaintiff there overstated her abilities, and in a way that contradicted the medical evidence.

24

The ALJ in that case ignored the context of the plaintiff's statements and reached a conclusion that contradicted the evidence. Here, Plaintiff's statements about her unwillingness to work–which the ALJ interpreted as statements indicating that she could work, but chose not to–do not contradict the medical evidence upon which the ALJ relied. Moreover, Plaintiff's statements here are not about her ability to work, but about her desire to do so. The question of Plaintiff's willingness to work is a different one than her ability to work. She could be eligible for benefits even if she wanted to work more than anything in the world. As such, the Court will deny Plaintiff's motion on this basis as well.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED.** The Commissioner's motion for judgment on the pleadings is **GRANTED**. The decision of the Commissioner is affirmed.

Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED.**

Dated: September 26, 2018